[L. A. No. 11514.   In Bank.—September 28, 1932.]

THE L. W. BLINN LUMBER COMPANY (a Corporation), Appellant, v. THE COUNTY OF LOS ANGELES et al., Respondents.

E. S. Williams for Appellant.

Erwin P. Werner, City Attorney, Everett W. Mattoon, County Counsel, and Gordon Boller, Deputy County Counsel, for Respondents.

PRESTON, J.—Appeal by plaintiff from judgment for defendants in an action to recover taxes for the year 1924, paid under protest (sec. 3819, Pol. Code), upon a possessory, or leasehold, interest in tide lands owned by the City of Los Angeles. Said judgment rests upon findings of fact and conclusions of law, the substance of which will now be set forth:

The court found that in 1917, as the result of the settlement and compromise of litigation between the City of Los Angeles and the Southern Pacific Railroad, the city leased certain tide lands to the railroad without the specification of rental, the lease to terminate in 1947; that in 1918 said railroad assigned to Consolidated Lumber Company, a corporation, all of its interest in and to a portion of said tide lands, comprising some 27.56 acres, more or less; that in 1920 the latter company in turn contracted with plaintiff to sublet or assign to it the estate in said lease at an annual payment of $300 per acre for the first five years, increasing materially at the commencement of the second, third, fourth

and fifth respective five-year periods thereafter, then to be at the rate of $600 per acre per annum for the balance of the term of the lease, expiring July 23, 1947; that since January 1, 1920, plaintiff had possessed, occupied and used said territory.

The court further found that in 1924, the Los Angeles County assessor entered against plaintiff an assessment upon the following described property: "Unsecured personal property as follows: The leasehold int and all other rights of L. W. Blinn Lbr Co in and to lands described under L A City Ord H C O 833 or otherwise"; that by said description the assessor had in mind and intended to describe plaintiff's said leasehold interest above referred to, although said description failed to describe said interest sufficiently to identify it, "L A City Ord H C O 883" being an order of the board of harbor commissioners and not an ordinance; that, however, plaintiff was not misled or prejudiced by said defective description and on March 27, 1924, rendered to said assessor a statement under oath setting forth specifically its leasehold or possessory interest, which is the estate here under consideration.

The court further found that the annual payments mentioned did not represent the full value of the occupancy and use or the full rental value of said premises; that said assessor placed a valuation of $110,240 upon plaintiff's said interest, pursuant to which a tax of $4,133.99 was levied for the year 1924 and paid under protest in writing by plaintiff.

The court further found that the full cash value of plaintiff's said leasehold and possessory interest on the first Monday in March, 1924, was $114,058 and stated that "in determining the value of said property the court considered the payments to be made by plaintiff to the Consolidated Lumber Company pursuant to the written agreement set forth in paragraph V of these findings, as installments of a purchase price and not as rental".

The court then found that the sum of $110,240 set forth in said assessment was ascertained and fixed by the assessor as follows: That said assessor valued the fee-simple title of the lands within the exterior boundaries of said portion of tide lands at $13,000 per acre; that said assessor next capitalized at six per cent the amount per acre per annum then being paid by plaintiff to Consolidated Lumber Com-

pany under said agreement of 1920, to wit: The sum of $300, and by such capitalization derived the figure of $5,000; that said assessor thereupon deducted said $5,000 from said fee value of $13,000 per acre and thereby derived an amount of $8,000 per acre, of which he took fifty per cent, viz., $4,000 multiplied said sum of $4,000 by 27.56, being the number of acres, thereby deriving said assessment figure of $110,240.

The court also found that said assessment was made without any purpose or intent of requiring plaintiff to pay an excessive or unlawful tax or to bear a burden unequal to that of other taxpayers, although it was true that in the case of a few small isolated parcels of real property within said county, leased to private individuals for a short term, the leasehold or possessory interests escaped assessment and taxes for the year 1924. The court found that at the hearing before the board of equalization plaintiff had an opportunity to offer all the evidence it desired in reference to said alleged overvaluation of said possessory right and leasehold interest and that the conclusion of said board and its refusal to lower said assessed valuation was the result of its honest judgment, free from discrimination or arbitrary action.

As a matter of law the court concluded that the determination of the board of equalization that the sum of $110,240 was the full cash value of said possessory or leasehold interest was conclusive; that solely because of said defective description the assessment and tax was invalid; that, however, the tax was morally and equitably due and plaintiff, in good conscience, should pay it and defendants should retain it; hence that plaintiff was not entitled to a judgment refunding to it said tax. Accordingly, judgment followed for defendants, awarding them their costs of suit, and plaintiff appealed.

The contentions of appellant are: That the assessment of 1924 was grossly excessive because of adoption by the county assessor of a wrong theory and plan of assessment and particularly because of the admitted failure to take into consideration, as a proper deduction, plaintiff's obligation to pay the annual amounts or rentals due under said contract with the Consolidated Lumber Company; that allowing a grossly excessive assessment is constructive fraud on the

part of a county assessor and board of equalization approving it, which will be relieved against by the courts; also that the assessment was void in that it failed to comply with the requirements of the Political Code, sections 3650, 3884.

■ The latter point we deem to be without merit, inasmuch as all parties considered and acted upon the understanding that the property here in question was the property intended to be assessed and plaintiff also returned these premises for assessment. The first two questions, however, undoubtedly possess merit and will now be discussed.

■ The system employed by the assessor and confirmed by the board of equalization is manifestly unsound, for at most it is a doubtful plan to appraise the present reversionary interest and not the leasehold interest in the property. The system, as we understand it, was to appraise the fee title interest per acre and subtract therefrom the capitalized rental per acre paid by the lessee; then to multiply the result by the number of acres involved and take one-half the product in accordance with the rule of assessment applicable to all property in Los Angeles County.

This system, however, takes no account of the duration of the leasehold estate; hence, it would ordinarily carry the same valuation on the last year of the term as on the first. It ignores the fact that the estate of the lessee is a limited one and that the excess of annual benefits over burdens must of necessity be the important factor in such an appraisal. ■ The capital employed whether in making an outright purchase of the lease or in assuming the payment of rentals periodically, must, with interest, be amortized during the life of the lease in order to prevent the waste of capital and to reflect the true worth of the premises. Improvements placed upon the property which revert to the lessor should also be taken into account and amortized over the same period. Taxes and other fixed charges must also be considered. The combined net earnings of the lease over the entire term is its ultimate value and its present value as of any date upon any assumed rate of interest should be computed from this basis. For example, under the lease here in question, the average yearly rental per acre is $443.617. This sum capitalized at six per cent is $7,393.61. Subtracting this sum from $13,000, the fee value placed on said property by the assessor, leaves $5,606.39, one-half of

which is $2,803.19. If it be assumed that the gross earnings on said lease are the equivalent of six per cent upon $13,000, we will then have as the net annual return per acre the sum of $168.19 ($2,803.19x.06). Treating this last-mentioned sum as an annuity payable annually over the period of twenty-three years, its present worth would be $2,069.24 ($168.19x12.303). Multiplying this sum by the acreage involved would give $57,028.25 (27.56x$2,069.24), which is an approximation of the present value of the leasehold estate.

That substantially such a method is the proper one has already been determined in the case of *Hammond Lumber Co.* v. *County of Los Angeles*, 104 Cal. App. 235 [285 Pac. 896, 900]. The method there used was suggested by one Milton Moore, upon whose testimony the present findings were rested by the court. In the case cited, the court, in approving substantially the above system, said: "This witness fixed the value of the leasehold interest of plaintiff for purpose of assessment on the first Monday of March, 1924, at $204,650, taking into consideration the limitation of use to plaintiff's lumber business. He described his method of procedure in detail, stating that he first determined what he called a base value representing the present worth of a right in perpetuity to the lands, subject to the privileges and limitations of the lease. He then calculated the annual return that an owner might reasonably expect from property so valued at the rate of seven per cent, and the difference between such amount and the annual rent represented the annual benefit or saving to the lessee. To ascertain, however, the savings or bonus value on the first Monday of March, 1924, the savings of future years had to be reduced to present worth. So by a process which need not be followed here with particularity, the witness figured the full market value of the leasehold interest at $409,313, one-half of which amount, or roughly $206,650, was taken as the 'full cash value' for taxation purposes. The witness in his testimony thus demonstrated the application of the capitalization method, which in *Birch* v. *County of Orange*, 59 Cal. App. 133, 138, 139 [210 Pac. 57], was pronounced to be a fair and reasonable method of valuing a beneficial interest. (See, also, *Graciosa Oil Co.* v. *County of Santa Barbara*, 155 Cal. 140, 143, 144 [20 L. R. A. (N. S.) 211, 99 Pac. 483].)" This authority also quotes at length

from McMichael's "Long and Short Term Leaseholds", second edition, pages 90, 91, and from Zangerle's "Principles of Real Estate Appraising," pages 31 and 148.

In Klein on "Federal Income Taxation", page 782, paragraph 24:15, the following appears: "The value of a leasehold is ordinarily the present worth of the excess of the rental value of the property for the unexpired term over the contractual rent. Thus, where a lease had an unexpired term of fifteen years, the rent reserved thereunder being $53,000 per annum and fair rental value being $57,400 per annum, the value of the leasehold was held to be the present worth of an annuity of $4,400 for fifteen years."

Mr. E. A. Saliers, on page 334, section 2, of "Accountants' Handbook" states: "Value of Leaseholds. This depends directly upon the life of the lease. Ordinarily, improvements on leased land become the property of lessor on expiration of the lease; therefore all costs should be amortized during life of the lease. In *valuing leaseholds* it is necessary to deduct annual costs from annual income. The remainder is an *annuity* for the number of years the lease runs. Its present worth can be found by finding present worth of an annuity of $1 for the given number of years, and multiplying same by the amount of the annuity. If any sum is recoverable from lessor at expiration of lease, as is sometimes agreed upon in case of extraordinary improvements made by tenant, its present worth can be found by use of compound interest tables. This, added to present worth of the annuity, gives present worth of leasehold."

The contention is made by respondent that under the instrument here involved the plaintiff became the purchaser of the lease and not merely a subtenant thereunder. We regard this contention as injecting an immaterial factor into the case. Whether the lease be purchased outright, or whether it be purchased by installments or whether the installments paid be considered as rentals, in any event the outlay of capital thus involved must be amortized over the period of the lease in order to prevent a waste of capital assets.

Speaking on this subject, Mr. Saliers, in Accountant's Handbook, *supra*, page 466, part of section 10, again says: "When a lease is bought outright or a bonus is paid,

it appears on the books at a valuation. In case the balance sheet is to be used for credit purposes and, owing to great appreciation in property · values, the lease is worth much more than its book value, it is proper to indicate this in a footnote, or else to incorporate it in the balance sheet with an offsetting reserve. The amount at which the lease is carried on the books must be amortized over the period of the lease, the periodic charge being to *Rent*. If title to the building constructed on the leased land is to pass to the owner of the land upon expiration of the lease the cost of the building must be written off over the life of the lease.'' Again, at page 541, section 11, in part: ''Leaseholds which terminate at a fixed future date, as well as other assets having a definitely fixed time of expiration, must be systematically amortized or written down if capital is to be preserved. These may not depreciate in the strictly material sense of the word, yet the deterioration which takes place is analogous to that which occurs in case of depreciation of other forms of wasting assets. In the case of leaseholds, as in case of patents, the period over which the cost must be written off is definitely prescribed. Leaseholds may be paid for in annual sums, or there may be an initial bonus in addition to the annual sums. Such a bonus should be considered a deferred charge to be distributed over the period covered by the lease.''

Clearly, therefore, the method employed by the assessor and confirmed by the board of equalization was erroneous and worked greatly to the injury of appellant for a proper valuation would undoubtedly be not more than one-half the figure at which the leasehold was assessed. The fact that the property is cut off from the waterfront by intervening lands and may not be valuable except in connection therewith may likewise serve to lessen its value.

But, as shown by the finding above quoted, the court itself did not rely upon the action of the assessor. It placed its sole reliance upon the testimony of the witness Moore, the same witness who testified in the case of *Hammond Lumber Co.* v. *County of Los Angeles, supra.* However, it appears that in the present instance said witness altered his viewpoint and method of valuation and appraisals. Here he assumed the value of the right to the full use and occupation of the land in perpetuity to be the

market value of the fee and deducted from this its present value to the city due to the deferred enjoyment thereof. This latter sum he subtracted from said present market value of the whole of the land in perpetuity. This remainder he then divided by two and arrived at the figure of $114,058 (slightly in excess of the figure given by the assessor) which he declared to be the present value of the leasehold estate. But manifestly this system entirely ignores the factor of annual earnings and the existence of burdens thereon. Likewise it recognizes neither rent nor amortization of improvements. It ignores capital invested, fixed charges and other outlay. It is predicated solely upon the theory that the value of the use and occupation of the property is the present value of the fee-simple title thereto, lessened only by the present worth of that estate in fee simple to the owner of the reversion. The market value of the fee might serve as a basis for assuming an annual return, but where earnings are known the market value can shed only a dim light upon the subject of leasehold value. Furthermore, this system is also contrary to that approved by all the text-writers above cited as well as that announced in the case of *Hammond Lumber Co.* v. *County of Los Angeles, supra,* which rule this court refused to disturb when a hearing of the cause was sought. The principle here contended for was also approved in the case of *In re Metropolitan Building Co.,* 144 Wash. 469, 470 [258 Pac. 473], from the syllabus of which we take the following: "In assessing the value of a leasehold, the worth of the lease from year to year and considering the term, fixes the criterion; and in case of the tenant's improvements, with bonded indebtedness, profits must be figured after some plan of amortization for return of the money invested, whether reimbursing stockholders or bondholders for the money advanced or loaned."

This brings us to the last step: Will the court interfere to prevent such a gross overvaluation as appears in this case? We are not without authority upon this proposition. Article XIII, section 1, of the Constitution, requires that "all property in the state . . . shall be taxed in proportion to its value" and in this connection this court, in the case of *Birch* v. *County of Orange,* 186 Cal. 736, 742 [200 Pac. 647, 649], stated: "'A grossly in-

equitable and palpably excessive overvaluation' of property for taxation may be held constructively fraudulent'' (citing many cases). In other words where, as here, it appears that the assessor and board of equalization both adopted a manifestly erroneous method, showing a gross overvaluation of the property to be assessed, such an act, although, of course, unintentional, amounts to a constructive fraud or the equivalent of a fraud on the rights of plaintiff. On this subject the case of *Hammond Lumber Co.* v. *County of Los Angeles, supra,* states, at page 240:

''To invalidate the assessment there must be a conscious failure to exercise a fair and impartial judgment, or a resort to arbitrary methods varying from those employed in assessing other property of like character and situation, and resulting in the imposition designedly of an unequal burden on the property of the complainant. (*Los Angeles G. & E. Co.* v. *County of Los Angeles,* 162 Cal. 164, 166 [9 A. L. R. 1277, 121 Pac. 384]; *Miller & Lux, Inc.,* v. *Richardson,* 182 Cal. 115, 128 [187 Pac. 411]; *Pacific Coast S. S. Co.* v. *Richardson,* 186 Cal. 70, 72 [198 Pac. 1034]; *Pierce* v. *County of Santa Barbara,* 40 Cal. App. 302, 305 [180 Pac. 641]; *Birch* v. *County of Orange,* 59 Cal. App. 134, 136 [210 Pac. 57]; *Wild Goose Country Club* v. *County of Butte,* 60 Cal. App. 339, 342 [212 Pac. 711]; *Ambassador Hotel Corp.* v. *Los Angeles County,* 94 Cal. App. 143 [270 Pac. 726].)''

In the case of *Mahoney* v. *City of San Diego,* 198 Cal. 388, 402, 403 [245 Pac. 189, 195], where the plaintiff sought the recovery of taxes paid under protest and both the assessor and the board of equalization failed to recognize certain well-known factors which relate to valuation, the court said: ''We do not say that in assessing improvements upon real estate the elements of age, state of repair, location, cost of construction or of replacement are or that any one of them is controlling upon the assessor in the exercise of his judgment and discretion as to what valuations he shall place upon assessable improvements upon real estate; but what we do hold is that an assessment made by an assessor in accordance with a systematic and intentionally adopted theory for the arrival at valuations to be placed upon that form of property which omits to take into consideration any of the foregoing elements which

in common experience ordinarily determine values, and in place thereof substitutes an arbitrary basis for the fixation of values upon the several classes of such form of property for purposes of assessment upon a percentage plan, from which the foregoing elements for determining values are expressly excluded, will not be upheld when it sufficiently appears that actual discrimination has resulted from an assessment thus arrived at. When the determining principles leading to uniformity in distributing the burdens of taxation have been lost sight of or wilfully abandoned in the making of the assessment complained of, the asseveration of the assessor that he assessed that form of property 'at its full cash value' will not avail him in the presence of the actual and admitted facts supplied from his own lips; nor will his assertion, even though it be admitted to be true, that he acted honestly and in good faith in making the assessment in question suffice to compel the upholding of an assessment when the assessor making it, however honest and well-intentioned, has wilfully adopted and deliberately pursued a plan of assessment which is violative of the fundamental principles which should be his guide in the performance of his official duty; and when such an assessment is sufficiently shown to be replete with discrimination and lacking in uniformity in the burdens it imposes upon the owners of assessable property, such assessment will be invalidated at the instance of those property owners who shall pursue the proper statutory method to recover the taxes thus improperly imposed.''

The judgment is reversed.

Tyler, J., *pro tem.*, Waste, C. J., Langdon, J., and Curtis, J., concurred.

Rehearing denied.